Hercules Gasoline Company, Inc. v. Commissioner.
Hercules Gasoline Co. v. Commissioner
Docket No. 111038.
United States Tax Court
1944 Tax Ct. Memo LEXIS 162; 3 T.C.M. (CCH) 793; T.C.M. (RIA) 44255; July 31, 1944
*162 Melvin F. Johnson, Esq., 1025 Giddens-Lane Bldg., Shreveport, La., for the petitioner. Homer J. Fisher, Esq., for the respondent. TURNER Memorandum Findings of Fact and Opinion TURNER, Judge: The respondent has determined deficiencies in tax as follows against Hercules Gasoline Company, Inc. (Louisiana), and that petitioner, as transferee of the assets of that corporation, is liable for such deficiencies: Excess
Profits
Year
Income Tax
Tax
1937
$34,885.98
$862.49
1938
258.75
Issues presented by the pleadings are whether the respondent erred (1) in failing to allow certain deductions for 1937 and 1938 on account of depreciation and abandonment of plant, pipe lines and equipment; (2) in disallowing in 1937 and 1938 deductions taken as interest paid on preferred stock; and (3) in disallowing credit against undistributed profits tax for 1937. At the hearing the petitioner abandoned issue (1), thus leaving for determination only issues (2) and (3). Findings of Fact The petitioner is a Delaware corporation, organized in 1939, and domiciled in Wilmington. It admits liability as transferee of the assets of Hercules Gasoline Company, Inc., which was organized *163 under the laws of Louisiana in 1933, and was dissolved in 1939. The original charter of the Louisiana corporation, sometimes hereafter referred to as the transferor, was filed and recorded by the Recorder of Caddo Parish, Louisiana, on May 11, 1933, and contained the following: "ARTICLE II. "The objects and purposes for which this corporation is formed are hereby declared to be: * * * to borrow money and to issue, sell, pledge, or otherwise dispose of its bonds, debentures promissory notes, bill of exchange and other obligations and to secure same by mortgage, pledge or other hypothecation of any kind of property; to acquire by purchase or otherwise its own shares; * * * * *
"ARTICLE V. "The capital stock of this corporation is hereby fixed at 8,000 shares of no par value common stock and 400 shares of $50.00 par value of preferred stock, which said stock shall be paid for in cash at the time of issuance or for service rendered or property actually received and shall be full-paid and nonassessable. "The following rights, privileges and conditions shall attach to the shares aforesaid, viz: "(a) The preferred stock shall be entitled, out of any and all surplus net profits whenever *164 declared by the Board of Directors, to cumulative dividends at the rate of 8% per annum for each and every year from the issuance of such stock, payable semi-annually, in preference and priority to any payment of any dividend on the common stock for such year. "(b) The Board of Directors shall have the right to redeem any or all of the preferred stock at 102 ($51.00, per share) on any dividend date after giving thirty days written notice to the shareholder, and preferred stock thus redeemed and discharged shall not be reissued. "(c) The common stock shall be subject to the prior rights of the holders of the preferred stock as above declared and there shall be no dividend on the common stock until all of the preferred stock has been retired, redeemed and discharged. "(d) Each share of common stock shall be entitled to one vote at all shareholders meetings of the corporation. The holders of preferred stock shall have no voting power whatsoever, nor shall they be entitled to notice of any meeting of stockholders. * * * * "ARTICLE XII. "The corporation shall have authority to purchase and/or redeem its own shares of stock out of surplus available for dividends as per Sections *165 23 and 45 of Act 250 of 1928." At a meeting of the stockholders of the transferor, held on September 16, 1935, a resolution was adopted to amend the charter so as to increase the authorized number of shares of preferred stock from 400 to 1,400. Thereafter on October 3, 1935, the amendment to the charter was filed and recorded. The amendment as contained in the resolution and as made to the charter was in the same language as that contained in Article V of the original charter, except that the number of shares of preferred stock was shown as 1,400 instead of 400. After authorizing an amendment to the charter to increase the amount of preferred stock, the stockholders, at the same meeting, adopted the following resolution: "RESOLVED, that the preferred stock be issued at par to any creditor willing to accept same in full payment of his claim." All certificates of preferred stock, whether issued before or after the amendment to the charter, contained the following provision on the face thereof: FOR RIGHTS AND VOTING POWERS OF PREFERRED STOCK SEE ARTICLE V OF CHARTER. During 1937 and 1938 the transferor had outstanding 1,294 shares of preferred stock of a total par value of $64,700, *166 all of which had been issued prior to May 1, 1936, and all of which was retired in 1939. In making certain sales of preferred stock, J. B. Beaird, president of the transferor, represented to purchasers that the money invested in the preferred stock would be repaid with 8 percent cumulative "interest", and would be paid in full before any other stock obligations of the transferor were paid, or before any dividends were paid on the common stock. No representations were made as to any particular date when the amount invested in the preferred stock would be repaid, or that the payments of 8 percent would be made regardless of whether the transferor had any earnings. So far as disclosed, no payments were made prior to 1936 with respect to the 8 percent per annum on the shares of preferred stock. Nor prior to 1936 were any entries made on the transferor's books recording the annual amounts of such percent as interest, although an interest account was carried on the books. During 1936, D. W. Deupree entered the employ of the transferor as assistant secretary and bookkeeper, and kept its books until it was dissolved. Before entering the employ of the transferor, Deupree had been engaged *167 in practice as a public accountant and had been handling income tax matters practically ever since there had been a Federal income tax law. At his suggestion, percentage payments made on the transferor's preferred stock were entered as interest on its books. However, in his practice he had never seen a case where payments on a corporation's preferred stock were treated as interest on its books. In resolutions adopted by the transferor's directors at meetings held in December 1936, December 1937, January 1939, and May 1939, authorizing percentage payments on the transferor's preferred stock, such payments were referred to as interest on the preferred stock. In the transmittal notices accompanying checks issued to holders of preferred stock, and in information returns filed with the state and Federal tax authorities, the percentage payments were also referred to as interest. At least one holder of preferred stock reported the percentage payments as interest in his Federal income tax returns. In its income tax returns for 1937 and 1938, the transferor deducted as interest the amounts of $4,696 and $5,148, respectively, representing the percentage payments on its preferred stock. In *168 determining the deficiencies for those years, the respondent determined that the amounts were dividends paid on preferred stock and disallowed the deduction of them as interest. In determining the deficiency for 1937, the respondent determined that the provision in the transferor's charter which prohibited the payment of dividends on common stock so long as any of the preterred stock was outstanding did not constitute a contract prohibiting the payment of dividends within the meaning of section 26 (c) (1) of the Revenue Act of 1936. Accordingly, for the purpose of computing the undistributed profits tax for 1937, he allowed no credit, except the amount of $4,696 deducted by the transferor as interest paid on its preferred stock but determined by respondent to be dividends paid on such stock. As shown by the books of the transferor, it had current assets in the amount of $51,476.57 and current liabilities of $175,971.44, at December 31, 1937. Said amount of liabilities did not include a first mortgage loan of $50,000, which was being paid in monthly installments of $7,500 each. In determining a deficiency in tax of $15,017.86 against the transferor for 1936, the respondent allowed *169 no credit of any kind for the purpose of computing the tax on undistributed profits and computed a tax on such profits at $11,972.10. The transferor filed a petition, docketed at Docket No. 95530, with the Board of Tax Appeals against the determination of the deficiency. Among the errors assigned, was the respondent's disallowance of credit against undistributed profits tax because the charter provision restricting the payment of dividends on common stock was not a contract in prohibition of the payment of dividends under section 26 (c) of the Revenue Act of 1936. Respondent denied error. Thereafter, and without any trial being had, the parties filed a stipulation, in which it was stated that the amount of the deficiency was $3,086.70, and that the Board might enter its decision accordingly. Thereupon the Board entered its decision determining the amount of the deficiency to be as stated in the stipulation. The stipulation contained no statement of facts, nor any explanation as to how the amount of the deficiency stated therein was computed. Evidence submitted in the present proceeding discloses that it was based on a computation made by respondent, in which a dividends paid credit *170 of $73,749.90 was allowed. That amount was in excess of both the taxable net income and the adjusted net income as shown in the computation, and the allowance of it resulted in there being no undistributed net income. The record does not show what item or items entered into the computation of the $73,749.90. Opinion The petitioner contends that the transferor's preferred stock was not stock, but indebtedness, and that the payments made with respect thereto during the years 1937 and 1938 were payments of interest, not payments of dividends, and as interest constituted allowable deductions for those years. That the contention of the petitioner is without merit is, we think, evident from the provisions of the corporate charter under which the preferred shares were issued. The charter fixed the transferor's capital stock at no par value common and $50 par value preferred. With respect to the preferred stock, it provided that "out of any and all surplus net profits" such stock should be entitled "whenever declared by the Board of Directors to cumulative dividends at the rate of 8% per annum for each and every year from the issuance of such stock * * * in preference and priority to payment *171 of any dividend on the common stock for such year." The preferred stock was redeemable at $51 per share on any dividend date, after 30 days' written notice; the right to call such stock for redemption being in the transferor's board of directors. No dividends could be paid on common stock until the preferred stock had been retired, redeemed and discharged. Such being the charter provisions governing the preferred stock, its issuance and the rights of the holders thereof, we think it apparent that the relationship between the transferor and the holders of the preferred shares was not that of debtor and creditor, but that of corporation and stockholder. The shares had no maturity date, and the holders had no prior right to any payment thereon or thereunder except as to the holders of the common stock. There was no unconditional liability to pay any sum and no amount was payable in any event. The so-called interest distributions were payable only out of surplus net profits when declared by the board of directors. The board of directors had no power to make the payments from any other source. The status of the holders of the preferred shares was obviously inferior to that of regular corporate *172 creditors and was superior only to that of common shareholders. The fact that the transferor's president may have represented to prospective purchasers that the amounts invested in preferred shares would be repaid with interest and the further fact that the transferor entered the distributions made thereon on its books as payments of interest are in no way controlling. Such representations cannot and do not make of the preferred shares something they are not. The payments here in question were the payments of dividends and not payments of interest, and are not therefore deductible in determining transferor's net income. See and compare . The petitioner contends that the provision in the transferor's charter prohibiting the payment of any dividends, except on preferred stock, until all of the preferred stock had been retired, and the incorporation of such provision by reference in the preferred stock certificates amounted to "a written contract executed by the corporation" restricting the payment of dividends within the meaning of section 26 (c) (1) of the Revenue Act of 1936, and that the respondent erred in failing to allow *173 any credit with respect thereto in determining transferor's undistributed profits tax for 1937. In support of its contention, the petitioner relies on ; and , decided January 6, 1944. The respondent concedes that the decisions in those cases support petitioner's contention but points out that all the Circuit Courts of Appeals, except the Third Circuit, which have passed on the question, as well as this Court, have reached a contrary conclusion to that reached in the cases relied on by petitioner. In , promulgated June 15, 1943, on appeal to the Circuit Court of Appeals for the Sixth Circuit, we reviewed the status of the decisions involving the question whether charter and stock certificate provisions restricting the payment of dividends constitute a contract within the purview of 26 (c) (1). We found that the circuit court decision in the Lehigh Structural Steel Co., case stood alone, and declined *174 to follow it. In addition to the decisions mentioned and relied on by us in , see also , certiorari denied, . In that case, it was held that provisions in the corporate charter and in the preferred stock certificates requiring that before dividends were paid on other classes of stock five percent of the earnings of each year should be set aside to provide a sinking fund for the retirement of preferred stock did not constitute a contract restricting the payment of dividends within the meaning of section 26 (c) (1). We find nothing in the decision in , to warrant a departure from the position heretofore taken by us on the question here presented. In view of the foregoing, the contention of the petitioner is denied. The petitioner contends that the settlement of the transferor's tax liability for 1936 is res judicata of the question presented here, and that the respondent is estopped to contend that *175 the charter and stock certificate provisions prohibiting the payment of dividends on common stock until all of the preferred stock had been retired did not constitute a contract prohibiting the payment of dividends within section 26 (c) (1), supra. Since the parties voluntarily and completely settled the 1936 case by stipulation of the correct tax liability and the Board's decision was entered thereon, and since the tax liability of the transferor for the years in controversy herein constitutes a different cause of action, the petitioner's contention cannot be sustained. . The petitioner makes the further argument that the transferor "was unable to distribute profits in 1937 because it had none to distribute." Apparently it is the petitioner's view that the absence of undistributed profits is demonstrated by the fact that at December 31, 1937, "current liabilities" were substantially in excess of "current assets". We are further told of a $50,000 first mortgage loan, but we have no showing of the transferor's other assets and there is no claim that it had a deficit, operating or otherwise. The failure of proof *176 to support the argument here made is also accented by the fact that the deficiency notice shows undistributed net income for 1937 as $159,935.47. Aside from the issue involving the deductibility, as interest, of the percentage payments on preferred stock, the petitioner urges no issue affecting said amount of profits, and there is nothing of record to indicate that such amount was not correct. Such being the state of the record, the argument here made is without merit. The petitioner contends that the respondent's action in determining that the charter and stock certificate provisions prohibiting the payment of dividends on common stock until all of the preferred stock had been retired was not a contract within the provisions of section 26 (c) (1), supra, was arbitrary, capricious and discriminatory, and therefore unconstitutional. As heretofore indicated, we are of the opinion that the respondent's action in this respect was in accord with the provisions of section 26 (c) (1). The constitutionality of that section was sustained in . The contention of the petitioner is accordingly denied. *177 Decision will be entered for the respondent.